COMET ELECTRONICS, INC., et al.,
Plaintiffs,

v.

UNITED STATES of America, and Interstate Commerce Commission,
Defendants.

TRANS–MARK SERVICES, INC., et al.,
Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission,
Defendants.

GEORGE T. COOK, INC., et al.,
Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission,
Defendants.

Nos. 20405–1, 20694–1, 73 Civ. 2–W–1.

United States District Court,
W. D. Missouri, W. D.

Sept. 17, 1974.

Theodore C. Beckett, Morris, Foust, Moudy & Beckett, Kansas City, Mo., for Comet Electronics.

Landon H. Rowland, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for Trans-Mark Services, Inc.

Donald F. Martin, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for Geo. T. Cook, Inc.

Fritz R. Kahn, Gen. Counsel, ICC, Irving Jaffe, Acting Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Carla A. Hills, Asst. Atty. Gen., Harland F. Leathers, David C. Shonka, Attys., Dept. of Justice, Bert C. Hurn, U. S. Atty., Kansas City, Mo., for the Government.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

The pending cases involve challenges to subpoenas issued by the Interstate Commerce Commission to several persons not parties to a pending Commission investigation. The matter presently pends on defendants' Motion for Judgment on the Pleadings, Or, In the Alternative, For Summary Judgment.

For the reasons stated below, we conclude that defendants' motion must be granted.

### I.

The following facts were stipulated to by the parties:

By order dated June 26, 1970, the Commission instituted an investigation "into and concerning the management, business inter-relationships and transactions, financial, accounting and other practices of the Kansas City Southern Railway Company and Louisiana and Arkansas Railway Company in relation to their controlling holding company, Kansas City Southern Industries, Inc., and persons under common control with the two said carriers, particularly but not limited to whether carrier funds and assets have been used for purposes not necessary to the honest, economical, and efficient operation of such rail carriers, in order to determine whether such practices may involve violations of law administered by the Commission or may be inconsistent with the National Transportation policy * * *." (ICC Docket No. 35288)

Plaintiffs are not parties to the investigation commenced in ICC Docket No. 35288, but rather are corporations and persons who have extensive business ties with railroads and companies which are parties to that investigation. Plaintiffs have not, however, been in fact adjudicated as persons controlling, controlled by or under common control with a common carrier, nor has there ever been a finding by the Interstate Commerce Commission that plaintiffs are persons controlling, controlled by or under common control with a common carrier.

On November 19, 1971, the Commission's Bureau of Enforcement (hereinafter referred to as the Bureau) filed a petition requesting the issuance of subpoenas to Joseph F. Porter, Jr., R. O. Johnson, J. W. Scott, and R. S. O'Brien. The Bureau sought documentary evidence from the records and files of the plaintiff companies and the testimony on deposition of the named individuals. On the same day, copies of the petition were mailed to Porter, Johnson, Scott and O'Brien with a covering letter informing them that the copies were sent in compliance with the Commission order.

Comet Electronics, Conestoga Company, Great Western Enterprises, Inc., Porter and Johnson moved to dismiss the Bureau's petition, or, in the alternative, to vacate any subpoenas issued. The Bureau replied on December 22, 1971. On December 7, 1971, Watson, Ess, Marshall & Enggas wrote Secretary Oswald of the Interstate Commerce Commission advising that they represented Trans-Mark Services, Inc.; they acknowledged receipt of the Bureau's letter of November 19, 1971; and stated, *inter alia,* that objections to the issuance of the subpoenas might be raised if the Commission granted the Bureau's petition. On December 17, 1971, Secretary Oswald replied.

On February 8, 1972, the Commission entered its order directing that the subpoenas issue to the above-named parties. Documentary evidence was to be made available to representatives of the Commission within 20 days after the effective date of the order at the offices of the Interstate Commerce Commission in Kansas City, Missouri, and, beginning

50 days after the effective date of the order, testimony respecting matters related to the documentary evidence was to be taken on the deposition of, among others, Porter, Johnson, Scott, and O'Brien, at the offices of the Interstate Commerce Commission.

Plaintiffs Comet Electronics, Conestoga Company, Great Western Enterprises, Inc., Porter and Johnson filed a petition for reconsideration of their motion to dismiss.

The Commission denied plaintiffs' petitions and extended the effective date for the production of documents and for the depositions.

Plaintiffs Johnson and Porter were served with subpoenas requiring them to make available to the Bureau documentary evidence of plaintiffs Comet Electronics, Inc., and Comet Distributing Co., and Conestoga Co., and Great Western Enterprises, Inc., respectively by June 28, 1972, and to appear as a witness on the part of the Bureau on July 28, 1972. On June 23, 1972, the Bureau's counsel wrote plaintiffs Porter and Johnson informing them "the staff of the Commission will be available to inspect, copy, etc., the specified documentary evidence at your general offices or other appropriate places of business on and after June 26, 1972" and the Bureau counsel, in the case of plaintiff Porter, would be ready to depose him on July 28, 1972. Bureau counsel anticipated that plaintiff Johnson would not be deposed before August 1, 1972. Porter and Johnson have not tendered the specific documentary evidence and they have not appeared to give testimony.

Plaintiff Scott was served with subpoenas requiring him to make available the requested documentary evidence of plaintiff Trans-Mark Services, Inc. by June 28, 1972, and to appear as a witness on the part of the Bureau on July 28, 1972. On June 23, 1972, the Bureau's counsel wrote plaintiff Scott informing him that "the staff of the Commission will be available to inspect, copy, etc., the specified documentary evi-

dence at your general offices or other appropriate places of business on and after June 26, 1972," and that Bureau counsel anticipated that plaintiff Scott would not be deposed before August 3, 1972.

On June 26, 1972 Trans-Mark Services, Inc., and Scott filed with the ICC a petition to quash the subpoenas and to vacate the order directing their issuance and, on July 5, 1972, they filed an amendment to the petition. By order of August 18, 1972, the Commission denied plaintiffs' petition. On September 28, 1972, plaintiffs filed a petition for reconsideration of their petition to quash and to vacate the order for issuance of subpoenas. On October 3, 1972, the Bureau filed a reply.

On November 7, 1972, the Bureau wrote Watson, Ess, Marshall & Enggas renewing the offer to inspect, copy, etc., Trans-Mark's documentary evidence at its offices at a mutually convenient time or times on or after November 20, 1972, and advising that Bureau counsel would be ready to commence plaintiff Scott's deposition on December 18, 1972. Plaintiff Scott has not tendered the specific documentary evidence and they have not appeared to give testimony.

An attempt to serve the subpoenas on R. S. O'Brien disclosed that he had died on April 7, 1972.

On July 20, 1972, the Bureau filed a petition supplementary to its petition of November 19, 1971, requesting subpoenas to George M. Seymour, President and Treasurer of George T. Cook Company, Inc., and Executor of the Estate of R. S. O'Brien, deceased. On July 31, 1972, the Commission ordered that subpoenas be issued directing (a) production by Seymour of the documents specified in the Bureau's petitions of November 19, 1971 and July 20, 1972 and (b) the taking of Seymour's deposition.

On August 25, 1972, subpoenas for the production of documentary evidence of R. S. O'Brien doing business as George T. Cook Company and George T. Cook Company, Inc., and for testimony on

deposition, in accordance with the Commission's orders of February 8, 1972 and July 31, 1972 were served on Mr. Seymour. They required production of documents by August 30, 1972 and the taking of testimony beginning September 19, 1972. On August 31, 1972 Cook and Seymour filed with the Commission their special appearance and petition to quash the subpoenas and for vacation of the Commission's order of July 31, 1972. By order of October 16, 1972, the Commission denied the petition of Cook and Seymour. On November 6, 1972, plaintiffs filed their special appearances and petition for reconsideration of their petition to quash, and on December 14, 1972, the Commission ordered the petition denied.

The order of December 14, 1972 required that (a) documents be produced by January 2, 1973; and (b) deposition be taken by January 22, 1973. On December 26, 1972, the Bureau wrote to Blackwell, Sanders, Matheny, Weary and Lombardi, attorneys for Cook and Seymour, referring to its offers of August 28, 1972 and October 27, 1972 to allow their clients to elect the place for producing of documents and for depositions. Plaintiffs have not tendered the specific documentary evidence, as ordered and they have not appeared to give testimony.

The various plaintiffs thereafter filed three separate actions, which have been consolidated for the purposes of the pending motions. In each case, plaintiffs ask that the Court enter its order:

> finding the action of the Commission to be beyond the scope of its jurisdiction and annul or set aside the portion of the order which purports to subject Plaintiffs to the jurisdiction of the Commission and directing that subpoenas be served upon Plaintiffs for the production of documents and testimony for depositions before the Bureau of Enforcement and that the Court grant plaintiffs such other relief as may be just and equitable.

Defendants have answered and counterclaimed for enforcement of the subpoenas in each of the cases. Subsequently, defendants filed the present motions seeking (a) judgment on the pleadings on plaintiffs' complaints, and (b) summary judgment on their counterclaims.

## II.

█ Jurisdiction for each of these actions is asserted by plaintiffs under 5 United States Code §§ 701–706, 28 United States Code §§ 1336(a), 2321–2324, and 49 United States Code § 17(9). While we have serious doubts concerning our jurisdiction to entertain plaintiffs' actions, it is not necessary that we reach the questions presented in light of the Commission counterclaims in each case for enforcement of their subpoenas pursuant to 49 United States Code § 12(2). Those counterclaims, which invoke an independent federal jurisdictional ground, establish a proper jurisdictional base, even if plaintiffs' complaints were dismissed for lack of jurisdiction. Isenberg v. Biddle, 75 U.S.App.D.C. 100, 125 F.2d 741 (1941); Switzer Brothers, Inc. v. Chicago Cardboard Co., 252 F.2d 407 (7th Cir. 1958).

## III.

The parties have stipulated that the primary question of law presented is "whether the Commission may issue subpoenas to third persons who are not a party to an ICC investigation." All parties recognize that the resolution of this issue requires construction of the statute under which the Commission is proceeding.

Section 12 of the Interstate Commerce Act of 1887, as amended, provides in part that:

> The Commission shall have authority, in order to perform the duties and carry out the objects for which it was created, to inquire into and report on the management of the business of all common carriers subject to the provisions of this chapter, and to inquire

into and report on the management of the business of persons controlling, controlled by, or under a common control with, such carriers, to the extent that the business of such persons is related to the management of the business of one or more such carriers, and the Commission shall keep itself informed as to the manner and method in which the same are conducted. The Commission may obtain from such carriers and persons such information as the Commission deems necessary to carry out the provisions of this chapter; and may transmit to Congress from time to time such recommendations (including recommendations as to additional legislation) as the Commission may deem necessary. The Commission is authorized and required to execute and enforce the provisions of this chapter; . . . and for the purposes of this chapter the Commission shall have power to require, by subpoena, the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents relating to any matter under investigation [49 U.S.C.A. § 12(1) ]

The Act of February 10, 1891, 26 Stat. 743 (1891), amended the Act to provide for the use of depositions in Commission investigations. That Act provided in part that:

The testimony of any witness may be taken, at the instance of a party, in any proceeding or investigation depending before the Commission, by deposition, at any time after a cause or proceeding is at issue on petition and answer. The Commission may also order testimony to be taken by deposition in any proceeding or investigation pending before it, at any stage of such proceeding or investiga-

tion. . . . Any person may be compelled to appear and depose, and to produce documentary evidence, in the same manner as witnesses may be compelled to appear and testify and produce documentary evidence before the Commission as hereinbefore provided. [49 U.S.C.A. § 12(4) ]

Defendants contend that Section 12(1) "authorizes the subpoena of any relevant evidence." Plaintiffs, on the other hand, argue that the subpoena power of the Commission is limited to those "who are carriers, who control carriers, or who are controlled by or under common control with carriers." Plaintiffs argue that Section 12 grants the Commission authority only "to inquire into . . . the business of all common carriers . . . and . . . persons controlling, controlled by, or under a common control with, such carriers . . . ." Plaintiffs also contend that the language in the statute providing that the Commission "may obtain from such carriers and persons such information as the Commission deems necessary . . . ," is similarly limited to parties under investigation.

Plaintiffs' construction is an unreasonably narrow interpretation of the broad statutory mandate given the Commission by Congress. The plain language of Section 12(1) states that the Commission has the "power to require, by subpoena, the attendance and testimony of witnesses." There is no restriction concerning what witnesses may be called other than that their testimony must relate to "matters under investigation."

■ We conclude that plaintiffs' contention that the general term "witnesses" be limited by the specific terms of "common carriers" or "controlled by common carriers,"[1] is not tenable. We

---

1. Plaintiffs argue that the doctrine of *noscitur a sociis* is applicable, i.e., that the general word "witnesses" is limited by the more specific accompanying language. They argue, in substance, that because Congress went into some detail in specifying the persons subject to inquiry, it must have intend-

ed those limitations to apply throughout the statute. Plaintiffs' argument loses all of its apparent force when considered in light of the fact that in the original Act, there was little specificity concerning the persons subject to inquiry. The original statute referred only to "carriers" and the language

further conclude that the language of the statute must be read as it is written and that the Commission's authority to subpoena witnesses extends to persons not named as parties to an ICC investigation but who nevertheless may be able to give testimony or produce documents which may be relevant to a proper Commission investigation.[2]

Plaintiffs cite Harriman v. Interstate Commerce Commission, 211 U.S. 407, 29 S.Ct. 115, 53 L.Ed. 253 (1908), and Ellis v. Interstate Commerce Commission, 237 U.S. 434, 35 S.Ct. 645, 59 L.Ed. 1036 (1915) to support their contention. In *Harriman,* the Court considered the scope of the Commission's investigatory power. The case arose out of the Commission's investigation of various railroad combinations and consolidations, and the refusal of two witnesses to answer questions put to them by the Commission. The Commission argued that Section 12, which gave it power to require testimony "for the purposes of the Act," conferred broad, almost unlimited, power on the Commission to compel testimony in a wide range of investigatory proceedings. Justice Holmes, writing for the majority, disagreed:

> We are of opinion, on the contrary, that the purposes of the àct for which the Commission may exact evidence embrace only complaints for violation of the act, and investigations by the Commission upon matters that might have been made the object of the complaint. As we already have implied, the main purpose of the act was to regulate the interstate business of carriers, and the secondary purpose, that for which the Commission was established, was to enforce the regulations enacted. These, in our opinion, are the purposes referred to; in other words, the power to require testimony is limited, as it usually is in English-speaking countries, at least, to the only cases where the sacrifice of privacy is necessary,—those where the investigations concern a specific breach of the law.

Plaintiffs argue that a similar unwarranted invasion of privacy occurs whenever third parties are compelled to testify in Commission proceedings. We conclude that *Harriman* stands for no such general proposition. Questions concerning the power of the Commission to subpoena third party witnesses in investigations "upon matters that might have been made the object of complaint" were not presented in that case. Indeed, one of the two witnesses involved in *Harriman* was in fact a third party, and the Court expressed no doubt concerning the Commission's power to subpoena him.[3]

Ellis v. United States, *supra,* arose out of an investigation by the Commission into the circumstances surrounding the

---

concerning "controlling persons" was not added until 1940. Acceptance of plaintiffs' argument would support the notion that the original authors of the Act intended to give the Commission power only to call the carriers themselves during an investigation. We believe it obvious that Congress did not so intend, and conclude that the later addition of the "controlling persons" language cannot properly be viewed as a limitation of the ICC's subpoena power.

2. It should be noted that the pending cases involve subpoenas for *depositions* not for subpoenas to testify at a hearing before the Commission. Section 12(4) which deals only with depositions provides that: "*Any person* may be compelled to appear and depose, and to produce documentary evidence, in the same manner as witnesses may be compelled to appear and testify and produce documen-

tary evidence before the Commission as hereinbefore provided." It is possible to construe that language as granting authority independent of Section 12(1). Cf. United States v. Missouri Pacific Railway Co., 65 F. 903, 905 (C.C.Kan.1894).

3. The witness Kahn was a member of Kuhn, Loeb & Company, who were fiscal agents for the Union Pacific Railroad Company. At the time *Harriman* was decided, Section 12(1) did not contain the provision specifically authorizing the Commission "to inquire into . . . the business of persons controlling, controlled by, or under a common control with" a regulated carrier. Kahn was therefore clearly not a party to the proceedings, yet the Court did not suggest that his status differed from that of the other witness, an official of the Union Pacific.

use of private refrigerator cars by regulated carriers. In proceedings during that investigation, Ellis, an official of Armour Car Line, one of the private refrigerator car operators, refused to answer certain questions. The Commission filed an action in district court to compel him to answer.

On appeal from a district court order directing the witness to answer, the Supreme Court considered the Commission's power over a "stranger to the inquiry."[4] With Justice Holmes again writing the majority opinion, the Court found that the Commission was without power to inquire "into *the whole business* of the Armour Car Lines." [Emphasis added] But the Court did not hold that the Commission did not have any power over the stranger to the inquiry and its officials. On the contrary, Justice Holmes stated that:

> The Armour Car Lines not being subject to regulation by the Commission, *its position was simply that of a witness* interested in but a stranger to the inquiry. . . . Therefore the matter to be considered here . . . is how far *an ordinary witness* could be required to answer the questions that are before the court. [237 U.S. at 445, 35 S.Ct. at 647, emphasis added]

The Court then went on to analyze the particular questions propounded by the Commission to the witness. It found eleven of the twenty-seven questions to be relevant to the proper scope of the Commission's investigation and ordered them answered. The inescapable conclusion to be drawn from *Ellis*, therefore, is that non-party witnesses may be called upon for testimony before the Commission so long as the questions are relevant to a proper investigation. See also Interstate Commerce Commission v. Brimson, 154 U.S. 447, 476, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894); Interstate Commerce Commission v. Baird, 194 U.

S. 25, 46, 24 S.Ct. 563, 48 L.Ed. 860 (1904).

The Commission will therefore be entitled to an appropriate order directing enforcement of the subpoenas involved in this case, unless the questions raised in Parts IV and V below prove tenable.

### IV.

██ The second question presented is whether, given the Commission's general authority to subpoena third party witnesses, the Commission's actions in these cases were a valid exercise of that power. That question may be disposed of without extended discussion. The scope of judicial review is limited. See Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); 1 K. Davis, administrative Law Treatise, § 3.12 (1958). Generally speaking, judicial inquiry is limited to determining whether, based upon the circumstances reflected in the Commission's record as it relates to the scope and purposes of the investigation, the matter falls within the Commission's statutory authority.

The Interstate Commerce Act of 1940, 54 Stat. 899 (1940) substantially broadened the purposes of the Interstate Commerce Act. The "Declaration of National Transportation Policy" contained therein stated that:

> It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of rea-

---

4. At the time *Ellis* was decided, Section 12(1) did not contain the provision quoted in n. 3, *supra*. Thus, here, as in *Harriman*, the witness was not a party to the investigation itself.

sonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.

The Act of 1940 also amended Section 12(1) to authorize the Commission "to inquire into and report on the management of the business of persons controlling, controlled by, or under a common control with" regulated carriers. Section 13(2) presently authorizes the Commission "to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which a complaint is authorized to be made . . . or concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter."

■ It is our view, based upon the above statutes, that the subpoena power presently vested in the Interstate Commerce Commission is now generally consistent with Congressional grants of power to other administrative agencies.[5] Given these principles, plaintiffs' specific contentions may be easily disposed of.

■ Plaintiffs' initial contention is that the entire investigation herein involved is unauthorized because the Commission's authority does not extend to railroad holding companies, such as Kansas City Southern Industries, Inc. We disagree. Section 12(1) of the Act, quoted above, defines the authority of the Commission to investigate the affairs of carriers and related persons. More precisely, the Commission is authorized to investigate "the management of the business of all common carriers subject to the provisions" of the Act, as well as:

> The management of the business of persons controlling, controlled by, or under a common control with, such carriers, to the extent that the business of such persons is related to the management of the business of one or more such carriers. . . ." [49 U.S.C.A. § 12(1)]

In the July 26, 1970 order instituting the present investigation,[6] the Commission stated the subject matter under consideration. On its face the investigation as described in the order appears to fall squarely within the scope of the authority granted by Section 12(1). Under the standards set forth above, and in the absence of any factual contentions to the contrary, we conclude that the Commission's proceeding is within its statutory authority.[7]

---

5. For example, the Securities Act of 1933 authorized the S.E.C. to "subpoena witnesses, take evidence, and require the production of any books, papers, or other documents which the [S.E.C.] deems relevant or material to the inquiry." This provision has been held to authorize subpoenas to non-party witnesses, McGarry v. Securities and Exchange Commission, 147 F.2d 389, 392 (10th Cir. 1945). See also Brownson v. United States, 32 F.2d 844 (8th Cir. 1929); Freeman v. Fidelity-Philadelphia Trust Co., 248 F.Supp. 487 (E.D.Pa.1965); and F.C.C. v. Cohn, 154 F.Supp. 899 (S.D.N.Y.1957).

6. Quoted in Section I, *supra*.

7. In their brief in opposition to the pending motion, plaintiffs point to various correspondence and decisions of the Commission which plaintiffs contend constitute "admissions as to lack of jurisdiction" over transactions involving holding companies such as Kansas City Southern Industries. We have carefully read that data and draw no such conclusion. Instead, that data merely point out the Commission's lack of authority to regulate, in the particular circumstances therein described, conglomerate holding companies which have acquired carriers. Assuming the validity of that idea, a matter concerning which we express no opinion, it is clear that

**1242**

■ ˙ Plaintiffs also contend that the particular matters involving them, which are the bases for the Commission's subpoenas, are irrelevant to the main investigation and are therefore not authorized by the Act. The purposes for seeking the various subpoenas are outlined in detail in the Petition for Subpoenas filed by the Commission's Bureau of Enforcement on November 19, 1971. Specific reference is made in that document to particular transactions and circumstances involving the plaintiffs and the parties under investigation which led the Bureau to suspect a serious lack of compliance with the Act. We again conclude that, at this stage of the Commission's proceeding, the showing made in the petition is sufficient to sustain the issuance of the subpoenas.

■ ■ Finally, plaintiffs argue that the specific documents sought are not relevant to the investigation, even as construed above. In Adams v. FTC, 296 F.2d 861 (8th Cir. 1961), cert. den. 369 U.S. 864, 82 S.Ct. 1029, 8 L.Ed.2d 83 (1962), our Court of Appeals set forth the standards which courts should apply in dealing with similar questions. The Court noted that the agency has "discretion in determining what information it will require in making the investigation." The role of a court in an enforcement proceeding is simply to determine "whether the agency abused its discretion," that is, "whether the subpoena power has been confined to the rudimentary principles of justice." [Id. at 866]. See also McGarry v. S. E. C., 147 F.2d 389 (10th Cir. 1945). We have reviewed the various subpoenas (Exh. 13, 15, 17 and 30) and have determined that, under the guidelines set forth in *Adams*, all requests are "reasonably relevant" to the matters set forth in the Bureau's petition.[8]

We are also convinced that the subpoenas are not, as plaintiffs suggest, unduly burdensome and oppressive. As the Eighth Circuit pointed out in *Adams, supra*, 296 F.2d at 867, "broadness alone is not sufficient justification to refuse enforcement of a subpoena so long as the material sought is relevant." We are confident, based upon the excellent cooperation displayed by counsel in this case, that procedures may be worked out between counsel to minimize the disruption to plaintiffs' businesses while insuring the Commission's access to the needed documents.

In short, study of the documents presented to the Court under the stipulation of the parties demonstrates that the Commission is properly engaged in an inquiry, the purpose of which is to determine whether carrier funds and assets have been used in violation of applicable law or for purposes inconsistent with national transportation policy. We so find and conclude.

We further find and conclude that the Commission's inquiry and its investigation is directed to a purpose within the scope of the powers vested in the Commission by the Interstate Commerce Act, as amended, and that, consistent with the rationale of *Ellis*, the Commission may properly exercise the subpoena power vested in it under the circumstances of the pending cases.

V.

The final question posed by the parties in their stipulation is "whether the Commission followed all procedural steps required by law in the issuance of the subpoenas." No irregularity is apparent upon the stipulated record before us. Indeed, in their brief on this motion, plaintiffs do not even argue that the Commission made any procedural errors in processing these subpoenas. For

such an idea does not vitiate the Commission's authority to conduct the type of investigation involved in these cases.

8. Plaintiffs have not made any specific objections to particular requests, but have instead objected in conclusory terms to all requests. While we have carefully reviewed each specific request, we feel it unnecessary to engage in an item-by-item analysis of each subpoena in view of plaintiffs' lack of specificity.

these reasons, we must conclude that the Commission has followed all required procedural steps in authorizing and issuing the contested subpoenas.

### VI.

Accordingly, and for the reasons stated, it is

Ordered (1) that defendant's motion to dismiss plaintiffs' complaint should be and the same is hereby granted. It is further

Ordered (2) that defendant's motion for summary judgment on its counterclaim should be and the same is hereby granted. It is further

Ordered (3) that the plaintiffs obey the subpoenas issued to them by the Commission and each and every requirement thereof at such time and place as may hereinafter be fixed by the Commission.