CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, a corporation, Plaintiff-Appellant,

v.

CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, a corporation, Defendant-Appellee.

CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, a corporation, Plaintiff-Appellant,

v.

BURLINGTON NORTHERN INC., a corporation, Defendant-Appellee.

Nos. 74–1160, 74–1209.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1974.

Decided Oct. 23, 1974.

Christopher A. Mills, Chicago, Ill., for plaintiff-appellant.

O. L. Houts, Richard J. Schreiber, Chicago, Ill., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, and FAIRCHILD and SPRECHER, Circuit Judges.

CASTLE, Senior Circuit Judge.

Plaintiff Chicago and North Western Transportation Company ("North Western") appeals the dismissal of its complaints seeking enforcement of its protective services contract with the defendants Chicago, Rock Island and Pacific Railroad Company ("Rock Island"), and Burlington Northern Inc. ("Burlington"). North Western argues on appeal that the district court erroneously concluded that the contract was unenforceable because it had not been submitted to the Interstate Commerce Commission

as required by Section 1(14)(b) of the Interstate Commerce Act, 49 U.S.C. § 1 (14)(b)(1970). We reverse.

North Western, Rock Island, and·Burlington are common carriers by rail. North Western owns and operates a railroad terminal facility known as the Wood Street Terminal, which is used chiefly as a receiving and distribution center for carload shipments of perishable produce. Pursuant to Sections 1(3)(a) and 1(4) of the Act and applicable tariffs, North Western is obligated to provide protective service against heat and cold to refrigerator car shipments of perishables while they are under its control. Protection is accomplished by refilling the ice bunkers of the refrigerator cars while at the Wood Street Terminal with ice supplied to North Western under a contract with City Products Corporation, an independent contractor. City Products loads the ice into the bunkers at the direction of North Western.

■ North Western, Rock Island, and Burlington are parties to an agreement known as National Perishable Freight Committee Division Sheet 7 ("Division Sheet 7"), under which North Western is entitled to recover its actual cost of performing the protective services. Both Rock Island and Burlington, however, have not fully reimbursed North Western for the actual cost of the protective services rendered, and North Western filed the instant complaints to recover the amounts owed. Division Sheet 7 apparently has never been submitted to the ICC for approval, and the district court found that this fact precluded liability based on that agreement.

Section 1(14)(b) provides in part:

It shall be unlawful for any common carrier by railroad . . . to make or enter into any contract, agreement, or arrangement with any person for the furnishing to or on behalf of such carrier . . . of protective service against heat or cold . . . unless and until such contract, agreement, or arrangement has been submitted to and approved by the Commission as just, reasonable, and consistent with the public interest. . . .

In Chicago & N.W. Transp. Co. v. Atchison T. & S. F. Ry., 367 F.Supp. 801, 807–808 (N.D.Ill.1973), Judge Bauer concluded that Division Sheet 7 need not be submitted to the ICC for approval because Section 1(14)(b) does not apply to protective service contracts between common carriers themselves.[1] We agree. In Section 1(3)(a) of the Act, Congress has defined "person" to include "an individual, firm, copartnership, corporation, company, association, or joint-stock association. . . ." In that same section, however, Congress has separately defined "common carrier" as *inter alia,* "all persons, natural or artificial, engaged in . . . transportation . . . ." Thus, the definition of "person" is not sufficient to encompass "common carrier." Since Section 1(14)(b), which carefully differentiates between the two terms, applies only to agreements between a "common carrier" and any "person," Commission approval of protective service agreements between common carriers is not required.

The purpose behind the enactment of Section 1(14)(b) confirms our conclusion. Although the Act provides that it is the duty of every common carrier to provide protective services, these services were often supplied to or on behalf of the railroads by railroad-owned subsidiaries (car-line companies) which were not carriers and therefore not subject to Commission regulation. *See* Ellis v. ICC, 237 U.S. 434, 35 S.Ct. 645, 59 L.Ed. 1036 (1915). This prevented the Commission from determining the actual cost of providing protective services so that it would have a proper basis for prescribing cost-related tariff charges

---

[1]. Two other district courts have reached the same conclusion. Chicago & N.W. Transp. Co. v. Soo Line R.R., 384 F.Supp. 226 (N.D. Ill., 1974) ; Chicago & N.W. Transp. Co. v. Illinois Central Gulf R.R., No. 73 C 1167 (N.D.Ill., March 12, 1974).

to be paid for by shippers. *See, e. g.,* Refrigeration Charges on Fruits, Vegetables, Berries, and Melons From the South, 151 I.C.C. 649, 693 (1929). To remedy this situation, Section 1(14)(b) was included as part of the Transportation Act of 1940 to enable the Commission to exercise supervision over the cost of furnishing protective services by those who were not common carriers. Accordingly, Congress employed the term "person" in Section 1(14)(b) to achieve that end. *See* H.R.Rep.No.2832, 76th Cong., 3rd Sess. 65 (1940–41).

The court below relied on the Commission's report in Ex Parte No. 137, Contracts for Protective Services, 318 I.C.C. 111, 125 (1962), directing carriers to submit for its approval "contracts covering protective services which shall replace all prior contracts, including division sheet 7," to support its ruling that Section 1(14)(b) requires Commission approval of agreements between common carriers. *See also* 49 C.F.R. § 1032.2 (1973). That reliance, however, is misplaced. First, all of the agreements before the Commission in that report were between various carriers and specified protective service companies, and none was solely between rail carriers. Second, the question whether Section 1(14)(b) requires Commission approval of Division Sheet 7 was never raised in that proceeding. Similarly, that question was not raised before the Commission in Ex Parte No. 137, Contracts for Protective Services, 278 I.C.C. 531 (1950), where agreements for protective services between carriers were submitted by the carriers to the Commission for approval. We are satisfied that these decisions do not indicate any belief by the Commission that Section 1(14)(b) requires approval of protective service contracts between common carriers.

■ The district court also determined that Division Sheet 7 was unenforceable because City Products' contract to supply ice to North Western had not been approved by the ICC Section 1 (14)(b), however, only requires Commission approval of contracts between a common carrier and the person who furnishes the protective services. City Products did not contract to provide protection against heat and cold to North Western, and therefore the contract itself does not constitute a protective service agreement as contemplated by Section 1(14)(b).

■ Moreover, it cannot be found that City Products actually contracted to provide protective services to Rock Island and Burlington. Division Sheet 7 is not converted into a protective service agreement between City Products and the carriers by the fact that the cost of protective services to Rock Island and Burlington depends on the cost of ice to North Western, or by the fact that City Products loads the ice into the bunkers of the refrigerator cars. City Products does not receive any of the tariff revenues paid to North Western under Division Sheet 7, but is compensated for the ice under a separate contract at a stated annual price per ton, and the loading is done only at North Western's direction and in order to avoid needless duplication of effort. Thus, the arrangement here is readily distinguishable from that in Pacific Fruit Express Co. v. Akron, Canton & Youngstown, R. R., 355 F.Supp. 700 (N.D.Cal.1973) because in that case the mechanical protective service arrangement was directly between the car-line company and the carriers. We conclude, therefore, that the contract with City Products does not defeat the enforcement of Division Sheet 7 by North Western.

■ Finally, Burlington argues for the first time on appeal that North Western's actions to recover its uncompensated cost of providing protective services are in reality an attempt to obtain a retroactive division of freight revenues, and that as a result the actions are precluded by Section 15(6) of the Interstate Commerce Act and by Supreme Court decisions interpreting that section. The contention is without merit. North Western is not seeking any retro-

active readjustment of revenues, but only brings these actions to recover amounts owed as provided for by the terms of Division Sheet 7 in effect since its existence.

The judgments of the district court are reversed.

Reversed.

Holloway, Circuit Judge, filed a concurring and dissenting opinion.